UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 20 CR 631 |
| v. | ) | |
| | ) | Hon. Virginia M. Kendall |
| ELIAS QUINONES-FIGUEROA | ) | District Judge |

**GOVERNMENT'S POSITION PAPER**
**REGARDING SENTENCING FACTORS**

The news cycle in Chicago is dominated by violence. Particularly the senseless, reckless, and extremely dangerous violent crime of carjacking. Innocent persons living their lives and going about their business have found themselves with the barrel of a loaded gun pointed at them, threatened, and hurt as violent offenders forcibly take their vehicles away. Often these innocent persons' lives are put in jeopardy just so their vehicles can be used for a "joy ride." The common task of entering one's vehicle is no longer a mindless act. Citizens have been forced to change their daily habits out of fear that they could be the next victim and have their lives irreversibly changed.

During the middle of the day on May 27, 2020, defendant, and a juvenile, changed the lives of Victim A and B forever. Determined to steal a vehicle through the threat of the use of a firearm, defendant and the juvenile armed themselves and walked around the streets of Chicago looking for someone to victimize. Defendant and the juvenile decided that Victim A, who was cleaning the inside of his Chevy Tahoe, was an appropriate victim for a carjacking that day. Both defendant and the juvenile pointed their loaded firearms at Victim A demanding that he give up his

1

vehicle to them. After taking Victim A's car, defendant and the juvenile drove around for hours before spotting the police and subsequently driving erratically to escape. It was during this effort to avoid being arrested that defendant, traveling at speeds nearing 80 mph hit Victim B who was riding his bicycle on the street. Defendant crashed the vehicle, he and the juvenile ran, and were shortly thereafter arrested by the police.

The government believes this Court should fashion a fair and just sentence for defendant featuring an appropriate mixture of incarceration and supervised release that takes into account, (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (4) the need for the sentence to afford adequate specific and general deterrence to the criminal conduct; and (5) the need for the sentence to protect the public from further crimes of the defendant.

Considering the foregoing factors, the government recommends a sentence within the guideline range of 70 to 87 months' imprisonment consecutive to a statutory minimum sentence of seven years' imprisonment to be followed by five years' supervised release and the mandatory $200 special assessment.

I. **BACKGROUND**

On September 15, 2020, Elias Quinones-Figueroa was indicted in a two-count indictment charging him with carjacking, in violation of Title 18, United States Code, Section 2119 and carrying and brandishing a firearm during and in relation to the carjacking, in violation of Title 18, United States Code, Section 924(c)(1)(A). Dkt. No.

1. On March 8, 2022, defendant entered a plea of guilty, by way of plea declaration, to the indictment. Dkt. Nos. 36, 37.

## II. SENTENCING GUIDELINES

The government agrees with the United States Probation Department that defendant has no criminal history and therefore falls into a criminal history category of I. Using the 2021 Guidelines Manual, defendant's guidelines range is calculated as follows:

| | |
|---|---|
| 20 | Base offense level of a robbery, pursuant to 2B3.1 |
| +6 | A victim sustained permanent or life-threatening bodily injury, pursuant to 2B3.1(b)(3)(c) |
| +2 | The robbery was a carjacking, pursuant to 2B3.1(b)(5) |
| +2 | Defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from law enforcement, pursuant to 3C1.2 |
| <u>-3</u> | Acceptance of responsibility and timeliness of plea pursuant to 3E1.1(a) and 3E1.1(b) |
| 27 | Total offense level |

PSR at 7-8. Therefore, an offense level of 27, which, when combined with a criminal history category of I, results in an advisory sentencing guidelines range of 70 to 87 months' imprisonment on Count One. Additionally, defendant is subject to a statutory minimum sentence of 7 years' imprisonment on Count Two, which must be consecutive to the sentence on Count One. Further, any sentence imposed is to be followed by a period of supervised release not to exceed 5 years and a mandatory $200 special assessment.

### III. THE 3553(A) FACTORS WARRANT A SENTENCE WITHIN THE GUIDELINES RANGE OF 70-87 MONTHS' IMPRISONMENT TO RUN CONSECUTIVE TO 84 MONTHS IMPRISONMENT

#### a. Nature and Circumstances of the Offense

On May 27, 2020, defendant, and a juvenile[1] planned and agreed to carjack Victim A using loaded firearms. Defendant intended to use his firearm and knew that the juvenile intended to use his firearm, to cause death or serious bodily injury to Victim A if Victim A did not comply with their demand to give up his car.

Defendant and the juvenile walked up to an unsuspecting Victim A while Victim A's head was down as he cleaned the back of the front passenger seat inside of his 2008 Chevrolet Tahoe. With a loaded gun in his hand, defendant got in the driver's seat of the 2008 Chevrolet Tahoe and pointed his .22 caliber pistol at Victim A. The juvenile, also holding a loaded gun, pointed his gun at Victim A, told Victim A to, "Give it up" and got in the front passenger seat. Recognizing the threat to his life, Victim A backed away from the 2008 Chevrolet Tahoe as the armed defendant and juvenile took control of his vehicle. Defendant put Victim A's vehicle in gear and drove away with the juvenile in the front passenger's seat.

At approximately 6:12 p.m., three hours later, defendant and the juvenile were still driving around in Victim A's 2008 Chevrolet Tahoe. At Armour Street just past Grand Avenue defendant noticed a marked Chicago Police Department police vehicle. The police vehicle did not have the overhead lights or siren activated, yet despite that, in order to evade police detection, defendant and the juvenile agreed to try and evade

---

[1] On December 16, 2020, the juvenile was found guilty of aggravated vehicular hijacking in the Cook County Juvenile Justice Division.

the police. Defendant turned eastbound on Hubbard Street and increased his speed up to 78 miles per hour[2] as he blew through at least two stop signs without stopping. At that location Hubbard Street is lined with a mix of both residential and business, has parking on both sides of the street and has a designated bike lane on both sides of the street. With complete disregard for his life, the life of the juvenile, the lives of persons in cars on the streets and the lives of the pedestrians on the side of the road, defendant continued fleeing on Hubbard Street as he sped through a red light that gave vehicles on Ogden Avenue the right-of-way. While speeding through that red light, at nearly 50mph over the speed limit, defendant hit the rear wheel of the bicycle Victim B was riding on Ogden Avenue as Victim B crossed Hubbard Street. The impact caused Victim B to be thrown into the air, over the hood of a pickup truck and as he came down, Victim B slammed into the fender of the pickup truck before landing in the street. Victim B was seriously injured. A photo of the dent caused by victim falling from the air and hitting the fender of the truck is pasted below:

---

[2] With few exceptions, the lawful speed on Chicago streets is limited to 30 mph.



Victim B suffered multiple broken bones (including a compound fracture depicted in Exhibit A attached to the government's version) and still has not regained full range of motion in his limbs[3]. Several pedestrians were waiting at the corner of Hubbard and Ogden saw Victim B get struck and immediately started to render aid to Victim B.

After nearly killing Victim B on the bicycle, defendant swerved into westbound traffic, narrowly avoiding a head-on crash with cars on Hubbard at the red light waiting to turn onto Ogden Avenue. Several of those persons who were in their cars estimated that defendant was driving 80 mph as it barreled through the intersection and swerving so as not strike the cars in traffic. About 150 feet further on Hubbard, defendant hit a red Chevrolet SUV parked at approximately 435 Hubbard and spun around before coming to a stop in the middle of Hubbard Street. The picture depicted

---

[3] Medical records showing the extensive damage done to Victim B's leg and the numerous follow up surgeries for Victim B are attached as Exhibit B to the government's version.

6

below shows the distance the white 2008 Chevrolet Tahoe defendant carjacked from Victim A spun around before stopping in the middle of the street after defendant crashed it into the parked red Chevrolet SUV.



The pictures below depict below show the damage caused by the force of defendant crashing Victim A's car at speeds nearing 80 mph.

7







Due to the extensive damage defendant caused to the white 2008 Chevrolet Tahoe, defendant and the juvenile had to climb out of the passenger side window. Defendant ran towards the viaduct at Elizabeth Street then double backed towards Hubbard Street. A Good Samaritan, one who was almost hit head-on while defendant was driving, ran after defendant and took him down to the ground. Responding officers arrived moments later. Shortly after placing defendant in custody, an officer recovered a black bag containing the juvenile's loaded silver .380 caliber Taurus PT 138 Pro Millennium semiautomatic pistol and defendant's loaded silver .22 caliber Rohm RG 14 six shot revolver used to carjack Victim A. Pictures of the firearms defendant and the juvenile used to threaten Victim A's life with are depicted below.

9



Once back at the police district, defendant said that he and the juvenile did not have a plan and that they just did it [carjacking]. During his interview with the police, defendant attempted to minimize his role and denied that he had a gun. Defendant did admit that he was the driver and that he saw the police behind him as he drove Victim A's car. Defendant told police that he knew he hit Victim B on the bicycle after which he slammed on the brakes, hit a parked car, and spun around. Defendant told the police that after crashing Victim A's car, he climbed out the passenger side window because the door would not open and tried running away, but he was disoriented.

Both victims in this case were casually going about their day when due to defendant's actions, one found himself without a car after having guns pointed at him and the other found himself inches from death and serious bodily injury, the effects of which still confine him today. That callous disregard for life should not be taken lightly. Defendant's conduct demonstrates profound disrespect for the law and complete disregard for his fellow citizens, and the community at large. The nature and circumstances of his offense warrant a significant sentence. A sentence within the guideline range consecutive to 7 years imprisonment, followed by 5 years'

supervised release recognizes the serious nature of the defendant's conduct while providing just punishment.

### b. History and Characteristics of the Defendant

Elias Quinones-Figueroa is a 21-year-old who has not completed high school or obtained his GED. PSR at 3. He grew up not knowing his father. PSR ¶¶ 46, 47. Defendant reported that he grew up in the Humboldt Park neighborhood in Chicago and had a "pretty good childhood." PSR ¶ 47. According to defendant, his mother was strict with him and tried to protect him. PSR ¶ 48. Defendant reported that, "everything was okay" until 2018, when he turned 18. *Id.* Defendant stated it was at this time street gangs tried recruiting him and it was the rival gangs that began to "cause problems." *Id.* Although he was not charged with the offense, it was also at this time that defendant was arrested for attempted carjacking. As reported in the PSR and according to the arrest report, the victim of that carjacking was shot and defendant, who was on scene when the police arrived, was found to be in possession of a face mask matching the description of the face mask used by one of the attempted carjacking/shooting offenders. PSR ¶43.

This is defendant's first conviction for any crime. Prior to this crime, his life appeared to be headed in the wrong direction as he was associating with a bad crowd. Defendant's lack of criminal history and good upbringing make his commission of the instant offense baffling.

The lack of a criminal history of defendant is a mitigating factor. However, his characteristics are questionable as he pointed a loaded firearm at an innocent person, nearly killed at least one other person as he tried to escape from the police. The

history and characteristics of defendant coupled with the nature and circumstances of the offense, call for a sentence of incarceration within the guidelines consecutive to 7 years imprisonment followed by 5 years of supervised release.

### c. Adequate Deterrence

According to crime statistics, carjackings in Chicago rose 135% to 1,415 in 2020 from 603 in 2019.[4] Due to the prevalence of the crime in 2020, a carjacking task force was reinitiated and has since been increased by an additional 40 Chicago Police Department officers to address the continued prevalence of this crime. Carjackers terrorize the community. Society needs to know that the federal system takes carjacking seriously and will justly punish those that commit the violent offense.

More specifically, in this case, defendant and the juvenile carjacked Victim A in the middle of the day as he was cleaning his car. Not only did they take his car, but defendant threated Victim A' life by pointing a loaded gun at him. In addition, Victim B will never again be the same because of defendant. Victim B now lives in a constant state of struggle because of this defendant.

Specific and general deterrence call for a sentence within the guideline range consecutive to 7 years' imprisonment followed by 5 years' supervised release.

### IV. SUPERVISED RELEASE

Given the circumstances of the offense and the history and characteristics of defendant, the government recommends the maximum term of 5 years' supervised release. The defendant would benefit from being under the watchful eye of the Court.

---

[4] Carjackings more than double in Chicago during 2020, police say, perhaps as criminals blended in with masked public – Chicago Tribune

The applicable mandatory conditions of supervised release under 18 U.S.C. § 3583(d), to which the government has no objection, are set forth on page 16 of the PSR. The government also has no objection to the recommended discretionary and special conditions of Supervised Release set forth on pages 16-21 of the PSR and concurs with the probation officer's rationale for these conditions.

V. **CONCLUSION**

For the reasons set forth above and in its Government's Version of the Offense, the government respectfully requests that this Court impose a sentence within the Guidelines range concurrent to 7 years' imprisonment followed by 5 years of supervised release.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By: */s/Shawn McCarthy*
SHAWN McCARTHY
Assistant United States Attorneys
219 S. Dearborn Street, Suite 500
Chicago, Illinois 60604
(312) 353-5300